**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TELVIN SHAW, | |
| Plaintiff, | |
| v. | Case No. 16-cv-1065 |
| TARRY WILLIAMS, et al., | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Telvin Shaw sued the Illinois Department of Corrections (IDOC) and various IDOC employees for allegedly violating the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12132, 12203 (Counts I and VII); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (Count II); and the Eighth Amendment (Counts III, IV, V, and VI). [68]. Defendants moved for summary judgment. [170]. For the reasons explained below, this Court grants Defendants' motion.

## I.    Background

### A.    Local Rule 56.1 and Evidentiary Rules

The facts in this discussion come primarily from Defendants' Local Rule 56.1 statement of material facts [171] and Plaintiff's statement of additional facts [174]. Defendants ask this Court to admit all of their fact statements due to Plaintiff's inadequate denials of those facts. *See, e.g.*, [189] at 4.

This Court has broad discretion to enforce the local rules governing summary judgment. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014);

1

*Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 655 (7th Cir. 2011). Under the local rules, a party's responses to the other party's statements of fact must contain "specific references" to record evidence to justify any denial. Local R. 56.1(b)(3); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Thus, purely argumentative denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements. *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012); *Malec*, 191 F.R.D. at 584. District courts may disregard any improper denials and deem the opponent's corresponding fact statements admitted. *See Aberman v. Bd. of Educ. of Chi.*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017).

District courts may also disregard supplemental affidavits that "contradict prior depositions or sworn testimony." *Dunn v. Menard, Inc.*, 880 F.3d. 899, 910 (7th Cir. 1996) (citing *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996)). Generally, a party may not create issues of fact by introducing affidavits that contradict prior testimony unless the affidavit explains any discrepancies, mistakes, or ambiguous testimony in earlier depositions. *Id.* at 910–11.

Accordingly, this Court disregards Plaintiff's denials to the following paragraphs of Defendants' statement of facts: 18, 19, 22, 23, 29, 30, 32, 33, 38, 41, and 43. Those denials fail to cite record evidence that refutes Defendants' statements, and merely denying a fact that has evidentiary support "does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment." *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015). This Court also disregards Plaintiff's denials of paragraphs 35, 37, and 39, which cite portions of the

record that fail to refute the statements of fact. This Court deems admitted Defendants' corresponding statements of fact. *See Aberman*, 242 F. Supp. 3d at 677.

This Court also disregards the portions of the following paragraphs of Plaintiff's statement of facts that rely upon Plaintiff's affidavit: 1, 2, 10, 21, and 24. The cited sections of the affidavit impermissibly attempt to "create issues of fact" by contradicting Plaintiff's prior testimony without providing any explanation for the discrepancy. *See Dunn*, 880 F.3d. at 910–11. Thus, this Court strikes the improper sections of the affidavit and the statements of fact that rely upon those sections.

### B.    Stateville Facilities

Plaintiff is an inmate in IDOC's custody. [171] ¶ 1. At all times relevant to his claims, IDOC held Plaintiff at Stateville Correctional Center. *Id.* ¶ 16. At Stateville, inmates live in several cell houses, with cells organized into multiple levels, or "galleries." [174] ¶¶ 9–10. Stateville does not have elevators for inmates to travel between levels, so all inmates must use the stairs. *Id.* ¶ 9. The cell houses share a few common features, such as a guard house and showers. *Id.* ¶ 10. The Healthcare Unit, dining hall, facilities for religious services, commissary, and visitor meeting areas are on the ground level, in a central area separate from the cell houses. *Id.* In 2014, Plaintiff initially resided in a cell on the third floor of the "F" cell house. [171] ¶ 16.

### C.    Plaintiff's First Injury

On March 11, 2014, Plaintiff injured his right ankle playing basketball. *Id.* ¶ 17. A nurse in the Healthcare Unit examined Plaintiff and noted that he expressed some "movement pain." *Id.* ¶ 18. The nurse also observed that Plaintiff's ankle

showed "no redness or bruising," but exhibited "slight" swelling, tenderness, and a limited range of motion. *Id.* The nurse gave Plaintiff crutches and prescribed acetaminophen, ice, and a "lay in" permit, which let Plaintiff eat meals in his cell. *Id.* Plaintiff used crutches from March 11, 2014 until July 13, 2014. *Id.* ¶ 19. When Stateville failed to provide Plaintiff with lay-in meals, he ate food he previously bought from the commissary to avoid walking down the stairs to the dining hall. *Id.* ¶ 21. But Plaintiff used his crutches to walk down several flights of stairs to the visiting room, worship area, and other ground-floor facilities. *Id.* ¶ 19.

While he remained on crutches, Plaintiff wrote weekly request slips to Defendants Tarry Williams—Stateville's Warden—and Karen Rabideau—Stateville's Placement Officer—asking for a transfer to a cell in the lower gallery. *Id.* ¶ 20. Plaintiff never received a response. *Id.* In his deposition, Williams did not recall speaking to Plaintiff or having any written communication with Plaintiff. *Id.* ¶ 23. Williams further testified that he did not review any mail or letters sent to him in his capacity as Warden; instead, his secretary would review the letters he received and direct them to the relevant individuals for review. [171-7] at 37–38.

On March 18, 2014, Plaintiff visited the Healthcare Center for a follow up appointment. [171] ¶ 24. The nurse renewed his lay-in permit and his prescriptions for ice, crutches, and pain medicine. *Id.* On March 26, an X-ray of Plaintiff's right ankle showed no signs of a fracture. *Id.* ¶ 25. Plaintiff returned to the Healthcare Unit the next day, however, because his right ankle felt "swollen all the time"; the nurse again extended his lay-in permit and prescribed him pain medication, ice, and

crutches. *Id.* ¶ 26. In early April, Plaintiff saw Dr. Saleh Obaisi for an evaluation. *Id.* ¶ 27. Obaisi determined that Plaintiff had sprained his right ankle and prescribed an anti-inflammatory. *Id.*

As Stateville's Placement Officer, Rabideau controlled inmate cell transfers. [171-5] at 5. On June 19, 2014, Rabideau transferred Plaintiff from his cell in the "F" cell house to a cell in "E" house three flights above the ground floor. [171] ¶ 28. Rabideau testified—and Stateville records indicate—that this transfer was a routine matter. [171-5] at 12, 55. In her deposition, Rabideau explained that a "routine transfer" means any move not based upon a "medical reason." *Id.* at 12.

On July 11, Plaintiff visited Obaisi again; Obaisi determined that Plaintiff's ankle "had no swelling" and "no heat" and that Plaintiff could move his ankle "within normal limits." [171] ¶ 29. Plaintiff still complained of pain and asked for crutches. [171-3] at 59. Obaisi prescribed Plaintiff a single crutch for one week, pain medication, and a permit for Plaintiff to move to a low bunk in the lower gallery for 30 days. [171] ¶ 29.

Obaisi testified that he provided Plaintiff with a lower cell and bunk permit for Plaintiff's comfort rather than for medical reasons. *Id.* ¶ 30. Obaisi stated that "he never felt [Plaintiff] was disabled," and that no medical reason required Plaintiff to reside in a lower-level gallery because "if he is walking and carrying his weight everywhere, he can carry his weight on the stairway." *Id.* ¶ 31; [171-3] at 19, 58–59. Plaintiff disagreed with Obaisi and said that as of July 11 he was not "walking and carrying his weight everywhere." [173] ¶ 31.

Following the July 11 appointment, Plaintiff gave his low gallery and bunk permit to Defendant Jackson, a correctional officer. [171] ¶ 33. Rabideau stated that the lower galleries throughout the facility were overcrowded that month and "very few beds were open." *Id.* ¶ 34; [171-5] at 9–10. Before Plaintiff's second fall on July 13, 2014—discussed below—Rabideau testified that she had not received Plaintiff's low gallery and bunk permit. [171-5] at 20. Plaintiff contends that he wrote notes to Rabideau and Williams before July 13 asking to move to a lower gallery cell. [175-3] ¶ 10.

IDOC must adjust an inmate's housing or provide medical assistive devices when a physician or nurse completes a permit or referral for the move or device. [174] ¶ 11. As of July 2014, when an inmate received a low gallery and bunk permit from a physician, a copy of the permit was given to the inmate and a second copy went to the correctional officers in the inmate's cell house. [171-5] at 21–22. After officers received the permit from either the inmate or the Healthcare Unit they would inform Stateville's Placement Officer—Rabideau, in this case—who was responsible for arranging the transfer. *Id.* Defendant Sykes, a lieutenant, testified that correctional officers did not have the authority to grant transfer requests. [171-8] at 24, 29, 30.

Cell-house sergeants maintain a log of all permits received from inmates who have been approved for cell accommodations, and they update the log every 30 days. *Id.* at 31. Sykes testified that he did not remember seeing Plaintiff's medical permit. *Id.* at 51–53. Plaintiff, however, contends that on two occasions between July 11, 2014 and July 13, 2014, he spoke with Sykes, Jackson, and Defendant Officer Parker

about honoring his medical permit.  [171] ¶ 40.  According to Plaintiff, the officers told him that if he did not return to his cell, they would send him to segregation.  *Id.*

### D.    Plaintiff's Second Injury

On July 13, 2014, while using one crutch to walk down a flight of stairs from his cell to the yard, Plaintiff felt a sharp pain in his leg and fell.  *Id.* ¶ 41. Plaintiff testified that he lost consciousness for a minute and suffered injuries to his neck, back, ankle, and head.  *Id.*

Plaintiff testified that Defendant Kimberly Aye, a Correctional Medical Technician (CMT), directed inmates to place Plaintiff on a stretcher without safety straps, causing Plaintiff to twist and turn and suffer more pain.  [175-3] ¶ 12.  Aye completed an incident report, in which she noted that she found Plaintiff between galleries seven and five and transported him in a stretcher to the Healthcare Unit.  [171] ¶ 43.  Aye contradicted Plaintiff's statement that she had inmates help transport him, testifying that she had no authority as a CMT to direct inmates or to permit them to move from one cell house to another.  *Id.* ¶ 44.

At the Healthcare Unit, a nurse evaluated Plaintiff and determined that he suffered possible injuries to his neck, back, and right ankle.  *Id.* ¶ 45.  The nurse gave Plaintiff painkillers and, with Obaisi's approval, Plaintiff traveled via ambulance to an outside hospital.  *Id.*  At the hospital, a doctor evaluated Plaintiff, gave him pain medication, and ordered X-rays of Plaintiff's neck, back, and ankles.  *Id.* ¶ 46.  The X-rays indicated that Plaintiff had no broken bones.  *Id.*  Plaintiff returned to Stateville's Healthcare Unit in the evening and reported that he felt better.  *Id.* ¶ 47.

A Stateville nurse prescribed Plaintiff pain medication, a lay-in permit, crutches, and ice. *Id.* Plaintiff testified that when the medication from the hospital wore off, he again experienced severe pain. [175-3] ¶ 16.

Around July 13 or14, Rabideau transferred Plaintiff from his cell on gallery seven to a cell on the ground floor. [171] ¶ 48. On July 30, Plaintiff saw a nurse who extended his lay-in permit for another two weeks. *Id.* ¶ 49. On August 4, Obaisi evaluated Plaintiff and confirmed that he had suffered a sprained neck and back after his fall on July 13. *Id.* ¶ 50. Obaisi noted that Plaintiffs' X-rays were normal, referred him to physical therapy, and provided Plaintiff with crutches and a low gallery and bunk permit for 30 days. *Id.*

### E.    Plaintiff's Third Injury

On September 9, 2014, Plaintiff slipped and fell again while walking down a flight of wet stairs with the assistance of a crutch, injuring his ankle and head. *Id.* ¶ 51. Plaintiff saw Obaisi and another doctor, Martija, on September 10; they diagnosed Plaintiff with a back injury. *Id.* ¶ 52. Obaisi and Martija noted that Plaintiff's ankle was not swollen or warm and that he could bear weight on it. *Id.* The doctors prescribed pain medication and discontinued Plaintiff's use of crutches. *Id.* Obaisi concluded that Plaintiff was "too uncoordinated to use" crutches on steps "in slippery conditions," so the crutches could cause "greater injury." *Id.*

About a week later, Plaintiff borrowed another inmate's crutch to walk to the prison's visiting room. *Id.* ¶ 53. On his way back, a correctional officer took Plaintiff to see Chanel Barnett in the Healthcare Unit; Barnett told Plaintiff that he was not

allowed to use a crutch and had him return to his cell without it.  *Id.*

## F. Administrative Remedies

IDOC has a formal grievance process set out in the Illinois Administrative Code.  [171] ¶ 54; *see also* Ill. Admin. Code tit. 20, §§ 504.800–70.  Pursuant to Part 504F, the initial step in the grievance process requires inmates to attempt to resolve grievances through their counselor.  [171] ¶ 55.  If the grievance remains unresolved after 60 days, an inmate may file a written grievance with the prison's designated Grievance Officer.  *Id.*  This officer investigates the merits of the inmate's grievance and generates a report with the findings of the investigation, a conclusion, and any recommendation for relief.  *Id.*  The inmate's grievance and the Grievance Officer's report are then forwarded to the Chief Administrative Officer (CAO) or their designee for review and signature.  *Id.*  The final decision goes back to the inmate.  *Id.*

As the final step in the grievance process, the inmate may appeal the CAO's decision in writing to the IDOC Director by submitting the Grievance Officer's report and the CAO's decision to the Administrative Review Board (ARB).  *Id.* ¶ 56.  The ARB, as the Director's representative, reviews the appeal and determines whether the inmate's grievance can be handled without a hearing.  *Id.*  If so, the ARB notifies the inmate of this determination.  *Id.*  Otherwise, the ARB schedules a hearing to interview the inmate, examine relevant documents, and call witnesses.  *Id.*  The ARB submits a written report of its findings and recommendations to the Director or the Director's designee, who reviews the report and makes a final determination on the grievance.  *Id.*  The inmate then receives a copy of the report and the Director's final

decision. *Id.* The ARB maintains the original documents in its files pursuant to Department Rule 504F: Grievance Procedures for Committed Persons. *Id.* IDOC's grievance process provides for no further review or appeal beyond this step. *Id.*

Part 504F also provides that an inmate can request expedited review by submitting a grievance marked "emergency" directly to the CAO rather than to the inmate's counselor or the Grievance Officer. *Id.* ¶ 57. If the CAO determines that the complaint reveals a substantial risk of imminent personal injury or other serious harm to the inmate, IDOC may handle the grievance on an emergency basis. *Id.* If the CAO determines that the grievance does not warrant emergency review, the inmate must resubmit the grievance in accordance with the regular grievance process described above. *Id.*

According to Defendants, Stateville informs all inmates of the proper process for submitting and appealing grievances within IDOC and specifically at Stateville; inmates can also access grievance policies and procedures at any time through their counselor or at the law library. *Id.* ¶ 59. Plaintiff contends that he did not receive a copy of the documents explaining the grievance mechanisms and did not know that the grievance process required him to take any steps if he received no response from an IDOC official. [173] ¶ 59.

On July 28, 2014, Plaintiff filed an emergency grievance about his July 13 fall and the pain he experienced while being transported to the Healthcare Unit. [171] ¶ 60. Plaintiff claimed that on July 11 he had received a low gallery and bunk permit to move cells immediately, but Jackson, Sykes, and an IDOC sergeant refused to

honor the permit. *Id.* Plaintiff asked to see a specialist immediately to assess his medical issues and requested that the Healthcare Unit stop denying him adequate healthcare. *Id.*; [171-11] at 19.

On August 20, the CAO determined that Plaintiff's grievance did not constitute an emergency. [171] ¶ 61. The ARB instructed Plaintiff to resubmit his grievance through the normal process. *Id.* Plaintiff subsequently sent his grievance to the ARB, which responded on October 9, 2014, and told Plaintiff to provide a copy of the original grievance with the written responses from his correctional counselor, the Grievance Officer, and the CAO. *Id.* ¶ 62. After receiving the ARB's response to his July 28 grievance, Plaintiff submitted the grievance to his counselor but never received a response and took no further action. *Id.* ¶ 63. Plaintiff says that he did not know IDOC's grievance requirements and that he attempted to follow the proper procedure by resubmitting his grievance to his counselor. [173] ¶ 64.

Plaintiff filed another emergency grievance on September 11, 2014. [171] ¶ 65. The Grievance Officer reviewed that grievance on September 29, and the CAO ultimately denied it on October 9, 2014. *Id.* ¶¶ 65–66. Plaintiff admits that the grievance was denied but states that at the time he never received a response. [173] ¶ 66. Thus, Plaintiff says, he never attempted to appeal the September 11 grievance by submitting it to the ARB and as a result, the ARB never had an opportunity to make a final determination on the grievance. [171] ¶ 67.

Plaintiff sued Defendants in January 2016. [1]. He amended his complaint in July 2016, [26], and again in October 2016, [68]. In April 2018, Plaintiff dismissed

his claims against Obaisi, since deceased, and the parties agreed to substitute Obaisi's employer, Wexford, as a defendant.  *See* [167, 168, 169].  Defendants then moved for summary judgment on all remaining counts.  [170].

## II.    Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 248.  To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation.  *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence.  *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255).  The moving party bears the burden of establishing the lack of genuine disputes as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.    Analysis

### A.    Failure to Exhaust

Under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e *et seq.*, prisoners cannot file suit challenging prison conditions unless they first exhaust all

available administrative remedies.  *See* § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (under the PLRA, "a prisoner must now exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process").  Defendants bear the burden of proof when they assert failure to exhaust as an affirmative defense.  *Dale v. Lappin,* 376 F.3d 652, 655 (7th Cir. 2004).

Proper exhaustion requires prisoners to comply with agency deadlines "and other critical procedural rules."  *Woodford,* 548 U.S. at 90; *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require").  Thus, filing an untimely appeal or failing to appeal constitutes a failure to exhaust, meaning a court must dismiss the claim.  *See Burrell v. Powers*, 431 F.3d 282, 285 (7th Cir. 2005).

A prisoner's subjective beliefs about or misunderstanding of administrative grievance procedures do not excuse compliance.  *See King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015) (a prisoner must exhaust all available remedies "even if he expects the process will ultimately be futile"); *Twitty v. McCoskey*, 226 F. App'x 594, 596 (7th Cir. 2007) (noting that § 1997e(a) says nothing about a prisoner's subjective beliefs about available administrative remedies).  That said, the Seventh Circuit recognizes an exception to the exhaustion requirement that applies when prison officials make the grievance process "impossible to comply with," effectively making the process unavailable to the inmate.  *King*, 781 F.3d at 893.  This exception applies when prison

officials fail to respond properly to inmate grievances. *See Brengettcy v. Horton,* 423 F.3d 674, 682 (7th Cir. 2005); *Lewis v. Washington,* 300 F.3d 829, 835 (7th Cir. 2002). Similarly, if a prison requires inmates to file grievances in a specific manner, but fails to make instructions about that process available to inmates, then "no available" remedy exists. *Dale,* 376 F.3d at 656.

Here, Defendants seek summary judgment on Plaintiff's claims arising before July 28, 2014, and on any claims related to his crutches being taken away in September 2014, on the grounds that Plaintiff failed to exhaust his administrative remedies. [172] at 13–14.

### 1. First Emergency Grievance: July 28, 2014

Plaintiff filed his first emergency grievance on July 28, 2014, in which he complained about his July 13 fall and the pain he experienced while being transported to the Healthcare Unit. [171] ¶ 60. On August 20, the CAO determined that Plaintiff's grievance did not constitute an emergency and instructed Plaintiff to resubmit the grievance through the normal process. *Id.* ¶ 61. Plaintiff then sent his grievance to the ARB (rather than his Correctional Counselor), which asked Plaintiff to provide a copy of his original grievance with written responses from his Correctional Counselor, the Grievance Officer, and the CAO. *Id.* ¶ 62; [171-11] at 18. After receiving the ARB's response, Plaintiff then submitted the grievance to his counselor but never got a response and took no further action. *Id.* ¶ 63. Plaintiff argues that Stateville failed to inform him of the necessary steps to exhaust his administrative remedies. [175] at 15.

According to the ARB's Return of Grievance record, the ARB instructed Plaintiff to "provide a copy" of his written grievance, "including the counselor's response" and "the Grievance Officer's and Chief Administrative Officer's response, to appeal." [171-11] at 18. Plaintiff denies that he received a guidebook explaining the grievance procedures, [173] ¶¶ 54–59, but admits that the ARB gave him the instructions outlined above, *id.* ¶ 62.

Whether Plaintiff personally received a guidebook containing Stateville's grievance procedures remains disputed. But Plaintiff does not dispute that all inmates can access the grievance policies and procedures "at any time" through their counselor or the law library. *See id.* ¶ 59. Thus, under the Seventh Circuit's objective standard, Stateville made its process available to Plaintiff. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *Twitty*, 226 F. App'x at 596. Indeed, here the ARB specifically told Plaintiff how to submit his grievance properly. *See* [171] ¶ 62.

According to Plaintiff, however, he followed the instructions he received (both the CAO's instruction to submit the non-emergency grievance "in the normal manner" and the ARB's instruction to "provide a copy" of the counselor's response) when Plaintiff eventually submitted the grievance to his counselor, who never responded. [173] ¶ 64; [175-3] ¶¶ 18–19; [171-11] at 18-19. Under Plaintiff's version of events, the counselor's subsequent failure to respond to his grievance prevented Plaintiff from moving forward with his grievance and "effectively rendered" the process unavailable. *Brengettcy,* 423 F.3d at 682; *see also Dole*, 438 F.3d at 809 ("a remedy becomes 'unavailable' if prison employees do not respond to a properly filed

grievance"). Accordingly, this Court cannot grant summary judgment to Defendants for failure to exhaust because genuine issues of material fact remain as to whether Plaintiff meets the unavailability exception.

### 2. Second Emergency Grievance: September 11, 2014

Plaintiff filed a second emergency grievance on September 11, 2014, regarding his fall and resulting injuries from September 9. [171] ¶ 65. The Grievance Officer reviewed the grievance on September 29 and the CAO denied it on October 9. *Id.* ¶¶ 65–66. Plaintiff contends that he never received a response to this emergency grievance and thus never attempted to appeal the denial by submitting the grievance to the ARB. [173] ¶ 67.

The record does not establish when or whether prison officials notified Plaintiff of this denial, so Defendants have not met their burden to establish Plaintiff's failure to exhaust. *See Dale,* 376 F.3d at 655. Accordingly, this Court cannot grant summary judgment to Defendants for failure to exhaust.

### B. Qualifying Disability

This Court addresses Plaintiff's Rehabilitation Act claim together with his ADA claims because the same analysis governs both claims. *See Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). Under both statutes, Plaintiff must show that: (1) he is a qualified person; (2) with a disability; and (3) IDOC denied him access to a program or activity because of his disability. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). The ADA defines a disability as either "a physical or mental impairment that substantially limits one or more major life activities"; "a record of such an impairment"; or "being regarded as having such an impairment." 42

16

U.S.C. § 12102(1); *see also* 29 U.S.C. § 705(9)(b) (Rehabilitation Act's definition of disability refers to the ADA). Major life activities include walking, standing, bending, and caring for oneself. *Jaros*, 684 F.3d at 672.

Before Congress passed the ADA Amendments Act of 2008 (ADAA), "substantially limits" meant that an individual could not perform a major life function or was "significantly restricted" in "condition, manner or duration" from performing "a particular major life function, as compared to the average person in the general population." *Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 961 (7th Cir. 1996) (citing 29 C.F.R. § 1630.2(i–j)). But the ADAA broadened the definition of disability. *Cloutier v. GoJet Airlines, LLC,* No. 16-C-1146, 2018 WL 2220289, at *6 (N.D. Ill. May 15, 2018) (discussing amended text of the statute and subsequent regulations promulgated by the Equal Employment Opportunity Commission). After the 2008 amendments, an "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.*; *see also Hirmiz v. New Harrison Hotel Corp.*, 865 F.3d 475, 476 (7th Cir. 2017).

Now, courts assess whether an impairment substantially limits a major life activity without regard to the "ameliorative effects of mitigating measures, except ordinary eyeglasses or contact lenses." 28 C.F.R § 35.108(d)(1)(viii). Relevant factors include "the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment." *Smith v. Concentra, Inc.*, 240 F. Supp. 3d 778, 786 (N.D. Ill. 2017).

Plaintiff experienced recurring back pain. [175-3] ¶ 7; [175-17] at 17. But Plaintiff does not assert any claim arising from his back pain or contend that it qualifies as a disability. *See generally* [68, 175]. Nor does Plaintiff claim that his back pain comprised part of an underlying disability or related to his ankle injuries (aside from the fact that he experienced back pain at the same time he experienced ankle pain). *See* [175-3] ¶ 1. Thus, this Court examines only whether Plaintiff's ankle injury constitutes a disability under the ADA, as amended by the ADAA.

The ADA does not categorically exclude temporary impairments from its definition of a disability. *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 333 (2d Cir. 2014)). That said, the "duration of an impairment" may help determine "whether the impairment substantially limits a major life activity." *Id.* at 329. Impairments that last only for a short period of time are typically not covered under the ADA unless they are sufficiently severe. *See* 29 C.F.R. § 1630.2(j)(1)(ix) (app.). Examples of temporary, non-disabling impairments include "broken limbs, sprained joints, concussions, and influenza"—in other words, "non-chronic impairments" with "little or no long term or permanent impact." *Id.*

Thus, many district courts have found that run-of-the-mill short-term injuries do not qualify as disabilities under the ADA. *See Clark v. Boyd Tunica, Inc.*, No. 3:14-cv-00204, 2016 WL 853529, at *4 (N.D. Miss. Mar. 1, 2016) (broken foot that took two months to heal did not qualify as a disability under the ADA); *Martinez v. N.Y. State Div. of Human Rights*, No. 1:13-cv-1252-GHW, 2015 WL 437399, at *7–10 (S.D.N.Y. Feb. 2, 2015) (temporary injuries from fall did not constitute a disability); *Mastrio v.*

18

*Eurest Servs., Inc.*, No. 3:13-cv-564, 2014 WL 840229, at *4–5 (D. Conn. Mar. 4, 2014) (short-term pain from kidney stones did not qualify as a disability); *Budhun v. Reading Hosp. & Med. Ctr.*, No. 10-6921, 2011 WL 2746009, at *2–3 (E.D. Pa. July 14, 2011) (broken finger did not qualify as a disability); *see also Idell M. v. Vilsack*, E.E.O.C. Doc. 0120140792, 2016 WL 4426506, at *2 (E.E.O.C. Aug. 4, 2016) (affirming finding that ordinary, temporary recovery from foot surgery did not qualify as a disability).

According to Plaintiff, the ankle injury he sustained in March 2014 affected his ability to walk and limited his access to religious services, family visits, and the commissary. *See* [175-3] ¶ 8. The record shows that Plaintiff's March 2014 fall resulted in a painful ankle sprain for which he was prescribed pain medicine, crutches, and ice. [173] ¶ 18. Evaluating the facts in the light most favorable to Plaintiff, this Court accepts that Plaintiff's ankle injury impaired his ability to walk unassisted by crutches, which demonstrates *some* impairment of a major life activity. *See, e.g.*, *Clark*, 2016 WL 853529, at *4; [173] ¶ 17. That said, considering the nature and severity of Plaintiffs' ankle injury, this Court finds that Plaintiff's ankle injury did not *substantially limit* his major life activities as required to establish a claim under the ADA or the Rehabilitation Act.

First, nothing in the record suggests that Plaintiff's injury was severe or presented anything beyond an ordinary sprain. According to medical documentation, Plaintiff did not break any bones. [173] ¶ 25. Instead, the undisputed facts show that Plaintiff merely sprained his ankle and received ordinary treatment for such an

injury, including ice, crutches, and over-the-counter pain medication. *See* [171-9] at 227; [173] ¶ 31. As of July 2014, Plaintiff's ankle was no longer swollen, he had recovered his full range of motion, and "it was not medically necessary for Plaintiff to use crutches." [171] ¶¶ 30–31. Although this Court accepts Plaintiff's statements that he continued experiencing some pain, Plaintiff offers no evidence to contradict Obaisi's medical findings as to the nature or progress of his condition. Ordinary, temporary injuries that neither cause nor relate to longer-term impairments generally do not demonstrate a disability under the ADA, so those circumstances militate against finding that Plaintiff had a qualifying disability. *See Clark*, 2016 WL 853529, at *4 (collecting cases).

Second, Plaintiff fails to identify any precedent establishing that a sequence of unrelated injuries may be linked together to demonstrate a substantial limitation on a major life activity. Even construing all of Plaintiff's injuries as one injury—despite a total lack of evidence connecting them—Plaintiff's own timeline of events begins on March 11, 2014, and ends on September 9, 2014, a period just shy of six months. [68] ¶¶ 15, 36. As noted above, such a short-term impairment may qualify as a disability, but only if "sufficiently severe." *See Summers*, 740 F.3d at 329.

Here, Plaintiff fails to show such severity: the record shows that Plaintiff experienced ordinary recovery time between his injuries and suffered no lasting consequences from any of them. *Cf. id.* (finding that plaintiff had a qualifying disability where he remained wholly unable to walk for seven months and, absent surgery, medication, and physical therapy, likely would not have walked for an even

longer period). Obaisi testified that Plaintiff could put weight on his foot by July 2014, indicating that Plaintiff's initial injury healed normally. [171-3] at 19, 58–59. Plaintiff denies this statement in his affidavit, stating that at the time he was not "walking and carrying his weight everywhere." [173] ¶ 31. But Plaintiff's prior deposition testimony shows that, at a minimum, he could place some weight on the injured ankle because he walked from his cell down the stairs using only one crutch in July. *See* [175-17] at 55–57, 129.

In any event, Plaintiff's medical records show that by September 9, 2014, Plaintiff could walk unassisted by crutches. [171] ¶ 52. Thus, the entire period of Plaintiff's impairment lasted no more than six months, and for portions within that period, Plaintiff demonstrated significant improvement and increased mobility. The record contains no evidence of any lasting consequence or impairment past that period. These circumstances—brief, temporary periods of impairment which did not require surgery or other non-routine treatments—weigh against finding that Plaintiff suffered a disability within the meaning of the ADA. *See Clark,* 2016 WL 853529, at *6 (finding that a broken foot that affected the plaintiff's ability to walk for up to five months, but did not create any complications or long-term impact, did not qualify as a disability); *cf. Summers,* 740 F.3d at 329–33 (finding that the plaintiff presented a qualifying disability where an accident impaired his ability to walk for seven months and required surgery and therapy).

Overall, this Court finds no support in the law to conclude that Plaintiff's sprained ankle qualifies as a disability under the ADA. *See, e.g., Guary v. Upstate*

*Nat'l Bank*, 618 F. Supp. 2d 272, 275 (W.D.N.Y. 2009) (finding that the "plaintiff's broken ankle, resulting in twelve-week disability leave," did not qualify as a disability); *Street v. Maverick Tube Corp.*, No. 4:15-cv-02736, 2016 WL 8711338, at *6 (S.D. Tex. June 17, 2016) (noting that "a temporary injury, such as a broken foot, is not considered a 'disability' under the ADA.").

Because Plaintiff did not suffer a qualifying disability, this Court grants summary judgment to Defendants on Counts I, II, and VII.

### C.     Failure to Accommodate

This Court's finding that Plaintiff did not suffer a qualifying disability under the ADA or the Rehabilitation Act disposes of his claims arising from his alleged disability.   Even if Plaintiff had a qualifying disability, however, his failure to accommodate claims would still fail.

To establish a failure to accommodate claim under the ADA, Plaintiff must prove that: (1) he is a qualified individual with a disability; (2) a public entity denied him the benefits of its services, programs, or activities or otherwise subjected him to discrimination; and (3) the denial or discrimination occurred because of his disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (quoting *Jaros*, 684 F.3d at 672); *see also Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (citing 42 U.S.C. § 12132).   The analysis for the Rehabilitation Act remains functionally identical, with the additional requirement that the agency that denied the plaintiff services must accept federal funds, which IDOC does. *See Wagoner*, 778 F.3d at 592 (citing *Jaros*, 684 F.3d at 672).

Under either statute, a reasonable accommodation does not require a perfect cure for the problem. *See Stewart v. County of Brown*, 86 F.3d 107, 112 (7th Cir. 1996); *see also Wagoner*, 778 F.3d at 593 (holding that restricted access to facilities which resulted in longer wait times for a disabled prisoner did not establish a denial of services under either the ADA or the Rehabilitation Act). In defining a reasonable accommodation in correctional facilities, courts consider the accommodation "in light of the overall institutional requirements," including security and safety concerns and "administrative exigencies." *Love*, 103 F.3d at 561. This determination remains "highly fact-specific" and requires a case-by-case analysis. *Dadian v. Village of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001).

Although Plaintiff offers evidence that his location on a higher gallery made it difficult for him to access the commissary, religious activities, and family visits, that evidence alone does not prove that IDOC failed to accommodate him. Plaintiff admits that, from the date of his initial injury in March 2014 until Stateville moved him to a lower gallery cell on July 13, 2014, he could "go from place to place at Stateville" when using crutches—albeit at a slower pace than normal—including down the stairs. [175-3] ¶¶ 4, 19. IDOC also provided Plaintiff with accommodations including lay-in permits for meals and crutches. Plaintiff testified, however, that Stateville sometimes failed to provide his lay-in meals, in which case he ate food he purchased from the commissary. *Id.* ¶ 21. Overall, like the *Wagoner* plaintiff, Plaintiff had access to prison services but experienced inconveniences in the form of using crutches, walking more slowly, and occasionally relying on the food he purchased for himself.

Those minor, short-term inconveniences do not amount to a failure to accommodate under the ADA or the Rehabilitation Act. *See Wagoner*, 778 F.3d at 593 (holding that IDOC's failure to repair an inmate's wheelchair did not result in a denial of services even though it "impeded" the inmate's access to some facilities). Moreover, delays of weeks (or even months) in organizing an accommodation do not automatically constitute a failure to accommodate; here, Plaintiff received a lower gallery assignment within four months of his initial injury, which remains reasonable under the requisite standard. *See Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177–78 (7th Cir. 2013) (four-month delay in securing accessible parking was not failure to accommodate), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (20-month delay did not render accommodation unreasonable).

Plaintiff claims that IDOC violated his rights by refusing his continued requests to move to a lower gallery. Plaintiff says that between his initial injury in March 2014 and his second fall in July 2014, he wrote to Rabideau and Williams multiple times requesting to move to a cell in a lower gallery; Defendants deny ever receiving the letters. *See* [173] ¶ 20.

Here, however, that factual dispute is immaterial: even if this Court found that Defendants delayed Plaintiff's accommodation through July 13—the day Plaintiff suffered his second fall and Defendants honored his permit from Obaisi—the ADA excuses some bureaucratic delay in providing reasonable accommodations. As discussed above, such delays may extend over several months and remain reasonable,

absent a showing of bad faith (which Plaintiff has not made here). *See Jay*, 233 F.3d at 1017.

Lastly, Plaintiff alleges that Defendants denied him a reasonable accommodation after his second fall on July 13, 2014, when he was moved on a stretcher without safety straps and carried by medical technicians and other inmates to the Healthcare Unit. [68] ¶ 26. IDOC's rules prohibit the use of inmates to assist or transport other inmates during a medical emergency, and Defendants deny that other inmates moved Plaintiff onto the stretcher. [188] ¶¶ 8, 29. Even crediting Plaintiff's account, it remains unclear how improper transportation to the Healthcare Unit constitutes a failure to accommodate under the ADA or the Rehabilitation Act. Plaintiff does not support this claim or even address it in his response to Defendants' motion, *see generally* [175], and therefore waives that argument, *see Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). Besides, a reasonable accommodation "is a process, not a one-off event," so this single episode does not suffice to sustain a failure to accommodate claim. *Cloe*, 712 F.3d at 1178. Thus, this Court grants summary judgment to Defendants on Plaintiff's failure to accommodate claims.

### D. ADA Interference

A plaintiff bringing an ADA interference claim must prove that: (1) he engaged in protected activity; (2) he exercised or enjoyed ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of his protected activity; and (4) the defendants were motivated by an intent to discriminate. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017). Protected activities under the ADA include opposing or complaining about disability discrimination, such

as by filing formal complaints of discrimination. *Id.* Interference requires "more than a quarrel among neighbors or an isolated act of discrimination"; instead, plaintiffs must demonstrate a "pattern of harassment, invidiously motivated." *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009) (internal quotation marks omitted). That is, to demonstrate the requisite intent, a plaintiff must show that the defendant's actions reveal a discriminatory pattern of harassment and an intent to discriminate based upon the plaintiff's membership in a protected class—those with disabilities. *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004)

Plaintiff claims that he engaged in protected activity when he requested accommodations between March and July 2014. [175] at 9. Plaintiff alleges that IDOC interfered with his ADA rights when they transferred him to cell on a higher gallery floor and did not immediately grant his requests for accommodation. *Id.* In addition, Plaintiff testified that between July 11, 2014 and his fall on July 13, 2014, he had two conversations with Sykes and Jackson about honoring his low gallery and low bunk permits and they threatened Plaintiff with segregation if he did not return to his cell. [173] ¶ 40. Lastly, Plaintiff contends that IDOC interfered with his ADA rights when they confiscated his crutch after his third fall in September 2014. [175] at 10. Overall, this Court must determine whether Defendants interfered with Plaintiff's protected activity and, if so, whether that interference arose from an intent to discriminate. *See Halprin,* 388 F.3d at 330.

The record shows that Plaintiff moved from his cell in F House to a cell on a higher gallery on June 19, 2014. [171] ¶ 28. Stateville's records, corroborating Rabideau's statement, show that Plaintiff moved to a higher gallery as a matter of routine. [171-5] at 54–55. Plaintiff disputes Rabideau's explanation for his transfer and speculatively interprets the Stateville records to mean that the transfer was for "medical reasons." [173] ¶ 28.[1] But Defendants' unrebutted evidence—including Rabideau's statement and Stateville's transfer records—shows that Plaintiff's transfer resulted from "routine procedures within Stateville." [171-5] at 12.

In September 2014, Plaintiff fell while walking down a flight of wet stairs. [173] ¶ 52. After this fall, Obaisi revoked Plaintiff's crutches because he feared Plaintiff would injure himself further if he continued using them. *Id.* Nothing in the record suggests that these incidents formed part of a continued pattern of discriminatory practices against Plaintiff. *See Bloch,* 587 F.3d at 783. Instead, Obaisi's uncontested testimony shows that IDOC confiscated Plaintiff's crutches out of concern for his safety. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (explaining that wardens and other prison bureaucrats may properly "relegate to the prison's medical staff the provision of good medical care").

On July 11, Obaisi provided Plaintiff with a medical permit allowing him to move to a lower gallery. [171] ¶ 29. As to Plaintiff's interactions with Sykes and

---

[1] During her deposition, Rabideau explained the transfer records in detail. [171-5] at 12–19. Her testimony and the transfer records categorize the June 19 move as "routine." [171-5] at 55. Presumably, Plaintiff believes the move occurred for a medical reason because the row *above* the row for the June 19 move lists "medical reason" as the explanation. *Id.* But that row actually reflects that Plaintiff's July 13 move to a ground-floor cell after he returned from the outside hospital occurred for a medical reason. [171-5] at 55. Plaintiff's speculation to the contrary cannot create a genuine issue of material fact here. *See Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017).

Jackson about the permit, the nature of their conversation remains disputed, and may constitute an act of discrimination. Even accepting that as true, however, Plaintiff cannot demonstrate a "pattern of harassment" based upon that isolated episode alone. *See Bloch,* 587 F.3d at 783. Viewing the facts in the light most favorable to Plaintiff, this Court finds that Plaintiff fails to show that Defendants engaged in a pattern of harassment motivated by discriminatory intent. As noted above, Plaintiff offers no evidence showing that his first transfer to a higher gallery resulted from discriminatory intent and he fails to rebut Defendants' evidence that the transfer was a matter of routine within a crowded prison. *See* [171-5] at 18–19.

Overall, Plaintiff's claim fails because he lacks evidence of either a pattern of discrimination or any intent to discriminate. Here, Plaintiff merely identifies a number of different actors involved in isolated episodes, which does not suffice to show a "pattern of harassment." *Bloch*, 587 F.3d at 783; *see also DiCenso v. Cisneros*, 96 F.3d 1004, 1008–09 (7th Cir. 1996).

Crucially, Plaintiff offers none of the circumstantial evidence that typically supports finding discriminatory intent, such as discriminatory comments, different treatment for inmates outside of the protected class, or repeated expressions of animus. *See, e.g.*, *Bloch*, 587 F.3d at 786; *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529 (7th Cir. 1990). Plaintiff's entire theory of discriminatory intent appears to be that Defendants took various actions (removing his crutch, failing to immediately honor his low bunk permit, and so on) while knowing of his impairment. *See* [175] at 10. But—absent a disparate impact theory that Plaintiff does not

advance—discriminatory intent requires showing that Defendants acted "because of" and not merely "in spite of" a prohibited factor. *Bloch*, 587 F.3d at 785. Plaintiff offers no evidence and makes no argument showing that Defendants acted "because of" his alleged disability. Thus, this Court grants summary judgment to Defendants on Plaintiff's ADA interference claim.

### D. Eighth Amendment Claims

The Eighth Amendment entitles prisoners to adequate medical care. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must show that Defendants acted with deliberate indifference towards his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010). Even assuming (without deciding) that Plaintiff establishes the requisite elements under the Eighth Amendment, his claims fail because he cannot overcome the qualified-immunity defense that Defendants raised in their opening brief. [172] at 14–15.

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, qualified immunity protects officers who make "mere mistakes" of law, fact, or a mix of the two. *Id.* When a defendant invokes qualified immunity, the burden shifts to the plaintiff to show two things: (1) that the defendant violated a statutory or constitutional right; and (2) that the right was "clearly established" at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A court

may address the prongs in whichever order it prefers. *Pearson*, 555 U.S. at 236. The defendant merits qualified immunity if the plaintiff fails to meet his burden on either prong. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017).

"Clearly established" means that existing precedent "placed the statutory or constitutional question beyond debate" at the time of the alleged violation. *Id.* Plaintiff must show that "every reasonable official would understand" that his actions violated a given right. *Id.* Finally, a plaintiff cannot succeed by identifying clearly established law "at a high level of generality" not "particularized" to the facts of his case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

Here, contrary to well-settled precedent, Plaintiff fails to address his burden of overcoming Defendants' invocation of qualified immunity. *See* [175] at 15 ("Defendants are incorrect in their assertion that they are entitled to qualified immunity unless Shaw can point to an analogous case that establishes that he had a right to be free from the conduct he challenges in his Section 1983 claim."). Instead, Plaintiff offers a one-paragraph response on qualified immunity and argues that Defendants do not merit qualified immunity simply because the Seventh Circuit "has long been clear that deliberate indifference to an inmates [sic] serious medical needs violates the Eighth Amendment." *Id.* at 15–16 (citing *Lewis v. McLean*, 864 F.3d 556, 566 (7th Cir. 2017)). That general legal proposition holds true in the abstract, but it lacks any connection to the facts of this case and thus does not help Plaintiff. *See White*, 137 S. Ct. at 552 (a plaintiff cannot defeat qualified immunity by defining clearly established law "at a high level of generality"). Plaintiff's failure to meet (or

even attempt to meet) his burden on the second prong of the qualified-immunity analysis entitles Defendants to qualified immunity. *See Green*, 868 F.3d at 633. Thus, this Court grants summary judgment to Defendants on Counts III, IV, V, and VI.

## IV.    Conclusion

This Court grants Defendants' motion for summary judgment [170].  The Clerk shall enter judgment for Defendants and against Plaintiff.  All dates and deadlines are stricken.  Civil case terminated.

Dated:  August 7, 2018

Entered:

John Robert Blakey
United States District Judge